MICHAEL R. LOZEAU (Bar No. 142893)
Law Office of Michael R. Lozeau
67 Juanita Way
San Francisco, CA 94127
Tel: (415) 462-1964
Fax: (415) 462-6385
E-mail: mrlozeau@lozeaulaw.com

ANDREW L. PACKARD (Bar No. 168690)
MICHAEL P. LYNES (Bar No. 230462)
Law Offices of Andrew L. Packard
294 Page Street
San Francisco, CA 94102
Tel: (415) 431-2970
Fax: (415) 431-0410
E-mail: packardal@mindspring.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation; <br><br>        Plaintiff, <br><br>     vs. <br><br> STOCKTON STEEL, a corporation, and THE HERRICK CORPORATION, a corporation. <br><br>        Defendants. | Case No. \_\_\_\_\_ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

     CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA"), by and through its counsel, hereby alleges:

## I.    <u>JURISDICTION AND VENUE</u>

    1.    This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. Section 1251, *et seq.* (the "Clean Water Act"

1    or "the Act").  This Court has subject matter jurisdiction over the parties and the subject

2    matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A),

3    and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

4            2.      On February 24, 2005, Plaintiff provided notice of the Defendants' violations

5    of the Act, and of its intention to file suit against the Defendants, to the Administrator of the

6    United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region

7    IX; the Executive Director of the State Water Resources Control Board ("State Board"); the

8    Executive Officer of the Regional Water Quality Control Board, Central Valley Region

9    ("Regional Board"); and to Defendants, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

10   A true and correct copy of CSPA's notice letter is attached as Exhibit A, and is incorporated

11   by reference.

12           3.      More than sixty days have passed since notice was served on Defendants and

13   the state and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that

14   neither the EPA nor the State of California has commenced or is diligently prosecuting a

15   court action to redress the violations alleged in this complaint.  This action is not barred by

16   any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

17           4.      Venue is proper in the Eastern District of California pursuant to Section

18   505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located

19   within this judicial district.  Pursuant to Local Rule 3-120, intradistrict venue is proper in

20   Sacramento, California because the source of the violations is located within San Joaquin

21   County.

22   **II.    <u>INTRODUCTION</u>**

23           5.      This complaint seeks relief for Defendants' discharges of polluted storm water

24   from a metal fabricating facility into the waters of the United States in violation of the Act

25   and the State of California's "Waste Discharge Requirements (WDRs) For Discharges of

26   Storm Water Associated With Industrial Activities Excluding Construction Activities," State

27   Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as

28   amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-

COMPLAINT

DWQ, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, (hereinafter "General Permit" or "Permit").  Defendants' violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

6.      The failure on the part of persons and facilities such as Defendants and their industrial facility to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of the Sacramento-San Joaquin Delta (the "Delta"), the San Francisco Bay (the "Bay") and other area receiving waters.  The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the marine environment each year. With every rainfall event, millions of gallons of polluted rainwater originating from area industries pours into the San Joaquin River and the Delta.  In most areas of San Joaquin County, storm water drains completely untreated through the storm drain system directly to the waters of the Delta and other receiving waters.

7.      The continuing decline in water quality in the Delta is a matter of serious public concern.  Data gathered by CalFed, a coalition of 15 state and federal agencies analyzing water allocation issues, has confirmed that the Delta is a heavily polluted water body.  The entire Delta, all of its major tributaries, and the waterways in and around the City of Stockton have all been identified by the State Board, the Regional Board, and EPA as impaired water bodies under Section 303(d) of the Clean Water Act.  33 U.S.C. § 1313(d). Finally, the United States Geological Survey, in its National Water Quality Assessment, has concluded that the San Joaquin River basin is one of the most degraded and polluted basins in the entire country.

///

///

///

COMPLAINT

3

### III.   **PARTIES**

8.      Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Woodland, California. CSPA has approximately 2000 members who live, recreate and work in and around waters of the State of California, including the San Joaquin River, Sacramento River and the Delta. CSPA is dedicated to the preservation, protection, and defense of the environment, the wildlife and the natural resources of all waters of California.  To further these goals, CSPA actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

9.      Members of CSPA reside in the Delta and San Francisco Bay areas and use and enjoy the Delta for recreation and other activities.  Members of CSPA use and enjoy the waters into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged.  Members of CSPA use those areas to fish, sail, boat, kayak, swim, birdwatch, view wildlife and engage in scientific study including monitoring activities, among other things.  Defendants' discharges of polluted storm water impairs each of those uses or contributes to such impairments.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and the General Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

10.      Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

11.      Plaintiff is informed and believes, and thereupon alleges, that Defendant Stockton Steel is a business organized under the laws of the State of California.

12.      Plaintiff is informed and believes, and thereupon alleges, that The Herrick Corporation is a business organized under the laws of the State of California.  Defendant Stockton Steel is a wholly owned subsidiary of The Herrick Corporation.

COMPLAINT

4

IV.    **STATUTORY BACKGROUND**

13.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

14.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

15.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

16.    The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

17.    In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

18.    The General Permit contains certain absolute prohibitions.  Discharge Prohibition A(1) of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States.  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges

that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

19. The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Special Condition D(1)(a) of the General Permit and meeting each of the conditions set forth in Special Condition D(1)(b).

20. In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent To Comply ("NOI").  The General Permit requires existing dischargers to have filed their NOIs before March 30, 1992.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).

21. EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. 65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  EPA has established Benchmark Levels for the following parameters, among others:  Iron - 1 mg/L;  pH – 6.0-9.0;  Aluminum – 0.75 mg/L; Nitrate and Nitrite Nitrogen – 0.68 mg/L;  Zinc - 0.117 mg/L;  and Copper - 0.0636 mg/L.

22. Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must comply with the BAT and BCT standards.  The General

Permit requires that an initial SWPPP have been developed and implemented before October 1, 1992.  The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (Section A(2)).  The SWPPP's BMPs must implement BAT and BCT (Section B(3)).  The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby waterbodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials handled and stored at the site (Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, and a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (Section A(6)).  The SWPPP must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (Section A(7), (8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (Section A(9),(10)).

23.     Section  C(3) of the General Permit requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.  The report must be submitted to the Regional Board no later than 60 days from the date the discharger

first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard.  Section C(4)(a).  Section C(11)(d) of the General Permit's Standard Provisions also requires dischargers to report any noncompliance.  *See also* Section E(6).  Lastly, Section A(9) of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

24.     The General Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written Monitoring and Reporting Program no later than October 1, 1992.  Existing facilities covered under the General Permit must implement all necessary revisions to their monitoring programs no later than August 1, 1997.

25.     As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  Dischargers must conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season. All storm water discharge locations shall be sampled."  Section B(5)(c)(i) requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS"), specific conductance, and total organic content ("TOC") or oil and grease, certain industry-specific parameters, and toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  In addition, Section B(5) and Table D of the General Permit requires dischargers whose industrial activities fall within SIC Code 3411 to

analyze their storm water discharge samples for zinc, nitrogen, iron and aluminum. Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution.

26.     Section B(14) of the General Permit requires dischargers to submit an Annual Report by July 1 of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. Sections B(14), C(9), (10). Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Permit. *See also* Sections C(9) and (10) and B(14).

27.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $27,500 per day (violations from January 30, 1997 through March 15, 2004) and $32,500 per day (violations after March 15, 2004) pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365 and 40 C.F.R. §§ 19.1 - 19.4.

28.     The Regional Board has established water quality standards for the San Joaquin River and the Delta in the Water Quality Control Plan for the Sacramento River and San Joaquin River Basins, generally referred to as the Basin Plan.

29.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life."

30.     The Basin Plan establishes a dissolved oxygen standard of 6.0 mg/L for the San Joaquin River in and around Stockton.

31.     The Basin Plan establishes a standard for electrical conductivity in the Delta, including the waters surrounding the City of Stockton, of 0.7 mmhos/cm from April 1 through August 31 and 1.0 mmhos/cm from September 1 through March 31.

COMPLAINT

32.    The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5."

33.    The Basin Plan also provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs)."  The San Joaquin River has been designated for use as municipal and domestic supply.  The Delta has been designated for use as municipal and domestic supply.  Mosher Slough has been designated for use as municipal and domestic supply.

34.    EPA has established a secondary MCL, consumer acceptance limit for iron of 0.3 mg/L.  EPA has established a secondary MCL for aluminum of .05 - .2 mg/L.

35.    EPA has established numeric water quality standards for priority toxic pollutants.  These include, but are not limited to, the following pollutants:  zinc - 0.120 mg/L (hardness of 100mg/l) and copper - 0.009 mg/L (hardness of 100 mg/L).  EPA also has established numeric water quality criteria for aluminum of .087 mg/L (4-day average) and 0.75 mg/L (1-hour maximum).

## V.    STATEMENT OF FACTS

36.    Defendants operate a facility located at 3003 E. Hammer Lane in Stockton, California (the "Facility").  The Facility is engaged in metal fabrication.  The Facility falls within the Standard Industrial Classification ("SIC") Code 3441.  The Facility covers about 42-acres, the majority of which is unpaved and used for storing large steel beams and plates and miscellaneous equipment, including large forklifts and other vehicles.  On information and belief, Plaintiff alleges that there are at least two large buildings located on the property.  On information and belief, Plaintiff alleges that metal fabricating is conducted both inside and outside of these buildings.  Metal to be fabricated is transported in and out of these buildings for storage in the unpaved areas of the Facility.  Storm water is collected at the Facility.  A storm water collection channel can be observed along the western perimeter of the Facility.  Plaintiff is informed and believes, and thereupon alleges, that storm water collects in that channel as well as other drainage channels at the Facility.  The Facility discharges

COMPLAINT

10

storm water to Mosher Slough.  Mosher Slough is a tributary to the San Joaquin River and the Delta.

37.     The industrial activities at the site include the fabricating of large metal beams and plates, the storage, maintenance, and cleaning of equipment used to fabricate steel, and the outdoor handling, processing, and storage of various materials used in the fabrication process.

38.     Numerous activities at the site take place outside and are exposed to rainfall. These activities include the storage of raw materials and fabricated products, equipment used in the fabrication processes; the storage and use of vehicles and equipment for materials handling; and the storage, handling, and disposal of waste materials.  Loading and delivery of raw materials and finished products occurs outside.  Trucks enter and exit the Facility directly from and to a public road.  Fork lifts are the primary means of moving raw steel and finished products around the unpaved storage areas of the Facility.  Plaintiff is informed and believes, and thereupon alleges, that metal fabrication activities also occur in exposed areas at the Facility.

39.     Plaintiff is informed and believes, and thereupon alleges that, with the exception of the buildings and relatively small paved areas of the Facility used for parking employees and visitors vehicles, the Facility property is unpaved.  These unpaved areas are covered by debris, scrap, rusting metal objects, trash,
machinery in various states of disrepair, used, oily and rusting equipment and machinery parts, tanks, open drums and barrels, and wood pallets.  In addition, Plaintiff alleges on information and belief that many of the unpaved surfaces at the Facility include metal shavings, filings, fines, and other materials that are the result of the metal fabrication process.  These unpaved areas are exposed to storm water and storm flows due to the lack of overhead coverage, berms and other storm water controls.

40.     Industrial machinery and heavy equipment, including trucks and fork lifts, are operated and stored at the Facility in areas exposed to storm water flows.  Plaintiff is informed and believes, and thereupon alleges, that such machinery and equipment leak

contaminants such as oil, grease, diesel fuel, anti-freeze and hydraulic fluids which are exposed to storm water flows.

41.     The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming or roofing to prevent rainfall and storm water flows from coming into contact with these and other sources of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks an adequate system, such as a filtration system, to treat water once contaminated.

42.     Plaintiff is informed and believes, and thereupon alleges, that a storm water collection channel along the west side of the Facility contains water on days where no precipitation has occurred.  Plaintiff is informed and believes, and thereupon alleges, that non-storm water discharges are released to that channel.  Plaintiff is informed and believes, and thereupon alleges, that, during rain events, non-storm water and storm water commingle in the channel and are then discharged to Mosher Slough.

43.     From February 24, 2000 through February 24, 2005, Defendants took samples or arranged for samples to be taken of storm water discharges at the Facility on at least six occasions.  The sample results were reported in the Facility's Annual Reports submitted to the Regional Board.  Defendant Stockton Steel certified each of those annual reports pursuant to Sections A and C of the General Permit.

44.     Since at least February 24, 2000, the Facility has detected aluminum, zinc, copper, iron, and nitrogen in storm water discharged from the Facility.

45.     The levels of aluminum detected by the Facility in its storm water have exceeded the benchmark level for aluminum established by EPA.  This has occurred on at least six occasions since February 24, 2000.  The levels of aluminum detected by the Facility in its storm water are greater than the numeric levels EPA or the Boards have established as a benchmark level and/or numeric water quality standards applicable to aluminum in California.  This has occurred on at least six occasions since February 24, 2000.  For

COMPLAINT

example, on February 2, 2004, the level of aluminum measured by Defendants in the Facility's discharged storm water was 85.4 mg/L.  That level of aluminum was more than 113 times the benchmark level for aluminum established by EPA.  The level of aluminum measured at the facility on February 2, 2004 was more than 981 times the number established by EPA as a four-day average water quality criterion for aluminum.

46.    The levels of zinc detected by the Facility in its storm water have exceeded the benchmark level for zinc established by EPA.  This has occurred on at least six occasions since February 24, 2000.  The levels of zinc detected by the Facility in its storm water are greater than the numeric levels EPA or the Boards have established as a benchmark level and/or numeric water quality standards applicable to zinc in California.  This has occurred on at least six occasions since February 24, 2000. For example, on February 2, 2004, the level of zinc measured by Defendants in the Facility's discharged storm water was 2.26 mg/L.  That level of zinc is more than 19 times the benchmark level for zinc established by EPA.  The level of zinc measured at the facility on February 2, 2004 was more than 18 times the number established by EPA as a water quality criteria for zinc (based on a hardness of 100).

47.    The levels of copper detected by the Facility in its storm water have exceeded the benchmark level for copper established by EPA.  This has occurred on at least six occasions since February 24, 2000.  The levels of copper detected by the Facility in its storm water are greater than the numeric levels EPA or the Boards have established as a benchmark level and/or numeric water quality standards applicable to copper in California. This has occurred on at least six occasions since February 24, 2000. For example, on February 2, 2004, the level of copper measured by Defendants in the Facility's discharged storm water was 0.24 mg/L.  That level of copper was 3.8 times the benchmark level for copper established by EPA.  The level of copper measured at the facility on February 2, 2004 was more than 26 times the number established by EPA as a water quality criterion for copper (based on a hardness of 100).

48.    The levels of iron detected by the Facility in its storm water have exceeded the

COMPLAINT

benchmark level for iron established by EPA.  This has occurred on at least six occasions

since February 24, 2000.  The levels of iron detected by the Facility in its storm water are

greater than the numeric levels EPA or the Boards have established as a benchmark level

and/or numeric water quality standards applicable to iron in California.  This has occurred on

at least six occasions since February 24, 2000. For example, on February 2, 2004, the level

of iron measured by Defendants in the Facility's discharged storm water was 123 mg/L.

That level of iron is 123 times the benchmark level for iron established by EPA.  The level

of iron measured at the facility on February 2, 2004 is 615 times the number adopted by the

Regional Board as a water quality objective for iron.

49.     The levels of nitrogen as nitrate and nitrite detected by the Facility in its storm

water have exceeded the benchmark level for nitrogen as nitrate and nitrite established by

EPA.  This has occurred on at least five occasions since February 24, 2000.  For example, on

December 23, 2003, the level of nitrogen measured by Defendants in the Facility's

discharged storm water was 1.6 mg/L.  That level of nitrogen is 2.4 times the benchmark

level for nitrogen established by EPA.

50.     Plaintiff is informed and believes, and thereupon alleges, that since at least

February 24, 2000, Defendants have failed to monitor storm water discharged from the

Facility for total suspended solids, pH, specific conductance, and either total organic carbon

or oil and grease.  Defendants did not analyze any samples of storm water discharged from

the Facility for total suspended solids, pH, specific conductance, and either total organic

carbon or oil and grease from February 24, 2000 through at least February 24, 2005.  As of

the date of this Complaint, Defendant's Annual Reports do not include any monitoring

results for these parameters in the Facility's storm water.  As of the date of this Complaint,

Defendant's cannot produce any monitoring results for these parameters in the Facility's

storm water that was discharged at any time from February 24, 2000 through February 24,

2005.

51.     On information and belief, Plaintiff alleges that Defendants have prepared a

SWPPP for the Facility.  The SWPPP has not been provided to the Regional Board and is

not available in the public records at the Regional Board.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for the Facility that are consistent with BAT or BCT for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by Section A of the General Permit.

52.     Defendants maintain unpaved storage areas, conduct industrial activities out of doors, and store products and materials that are likely to lead to the contamination of storm water outdoors in areas lacking adequate storm water controls or containment, thereby allowing storm water to flow over and across these materials, activities and areas and become contaminated prior to leaving the Facility.

53.     Information available to CSPA indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged during rain events from the Facility directly to storm channels or drains that flow into Mosher Slough, the San Joaquin River and ultimately to the Delta.

54.     Mosher Slough is a water of the United States.  Mosher Slough is a tributary of the San Joaquin River.  The San Joaquin River is a water of the United States.  The San Joaquin River flows through and is tributary to the Delta.  The Delta is a water of the United States.

55.     Plaintiff is informed and believes, and thereupon alleges, that pollutants discharged by the Facility in its storm water are contributing to violations of water quality standards that currently exist in Mosher Slough, the San Joaquin River or the Delta.

56.     Information available to Plaintiff indicates that Defendants are discharging aluminum, iron, copper, zinc, nitrogen and other un-monitored pollutants that are causing or contributing to exceedances of applicable water quality standards.  Defendants are contributing to violations of water quality standards including, but not limited to, the narrative standard for toxicity and the numeric water quality standards for pH, copper, iron, electrical conductance, dissolved oxygen, and zinc.

57.     Information available to Plaintiff indicates that Defendants have not submitted

COMPLAINT

15

any reports pursuant to Section C(4)(a) of the General Permit within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmark Levels or applicable water quality standards.  Based on CSPA's review of available documents, Defendants have been or should have been aware of high levels of many of these pollutants prior to February 24, 2000.  Information available to Plaintiff indicates that Defendants have not filed any reports describing the Facility's noncompliance with the General Permit pursuant to Section C(11)(d) of the General Permit.  Plaintiff is informed and believes, and thereupon alleges, that, as of the date of filing of this Complaint, the Facility's SWPPP and site-specific BMPs have not been altered from the SWPPP and BMPs that have been in place since at least February 24, 2000.

58.    Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

59.    Plaintiff realleges and incorporates Paragraphs 1-58, inclusive, as if fully set forth herein.

60.    Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

COMPLAINT

61.     Plaintiff is informed and believes, and thereupon alleges, that since at least October 1, 1992, Defendants have been discharging polluted storm water from the Facility directly to storm channels or drains that flow into Mosher Slough, the San Joaquin River, and ultimately to the Delta, in violation of the General Permit.

62.     During every rain event, rainwater flowing over exposed products, waste materials and accumulated pollutants at the Facility becomes contaminated with pollutants and flows untreated from the Facility into the local storm drain system.  This contaminated storm water flows through the storm drain system into Mosher Slough, the San Joaquin River, and ultimately to the Delta.

63.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of the waters of the United States in violation of Discharge Prohibition A(2) of the General Permit.

64.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

65.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

66.     Every day since March 30, 1992 that Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

### SECOND CAUSE OF ACTION
**Non-Storm Water Discharges in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

67.     Plaintiff realleges and incorporates Paragraphs 1-66, as if fully set forth herein.

COMPLAINT

68.     Discharge Prohibition A(1) and Special Condition D(1) of the General Permit prohibit discharges of material other than storm water (i.e., non-storm water discharges) to a storm sewer system or waters of the United States, except under certain specified circumstances.  Unauthorized non-storm water discharges must be either separately permitted or eliminated.

69.     Plaintiff is informed and believes, and thereupon alleges, that since at least October 1, 1992, Defendants have been discharging unauthorized non-storm water which includes but is not limited to water resulting from industrial processes at the Facility which flows into storm drains and is discharged to Mosher Slough, the San Joaquin River, and the Delta in violation of the General Permit.

70.     Every day since October 1, 1992 that Defendants fail to address these non-storm water discharges from the facility in violation of the General Permit is a separate day of violation of the Act.  Those violations are ongoing and continuous.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION
**Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan
and the Best Available and Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

71.     Plaintiff realleges and incorporates Paragraphs 1-70, as if fully set forth herein.

72.     Section A and Provision E of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate Storm Water Pollution Prevention Plan ("SWPPP") no later than October 1, 1992.

73.     Defendants have failed to develop and implement an adequate SWPPP for the Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendants' outdoor storage of industrial materials, including waste materials, without appropriate best management practices; the continued exposure of significant quantities of industrial material to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of

COMPLAINT

18

1   EPA Benchmark Levels.

2          74.    The General Permit's SWPPP requirements and Effluent Limitation B(3)

3   require dischargers to reduce or prevent pollutants in their storm water discharges through

4   implementation of BAT for toxic and nonconventional pollutants and BCT for conventional

5   pollutants.  Defendants have failed to implement BAT and BCT at the Facility for its

6   discharges of aluminum, iron, copper, zinc, nitrogen and other un-monitored pollutants in

7   violation of Effluent Limitation B(3) of the General Permit.

8          75.    Defendants have failed to update the facility's SWPPP and BMPs in response

9   to the analytical results of the Facility's storm water monitoring.  Defendants have failed to

10  submit reports pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming

11  aware of levels in the Facility's storm water exceeding the EPA Benchmarks and applicable

12  water quality standards.  Defendants have not filed any reports describing its noncompliance

13  with the General Permit in violation of Section C(11)(d).  Lastly, the SWPPP and

14  accompanying BMPs have not been altered as a result of the annual evaluation required by

15  Section A(9).

16         76.    Each day since October 1, 1992 that Defendants have failed to develop,

17  implement and update an adequate SWPPP for the Facility and implement BAT and BCT in

18  violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act,

19  33 U.S.C. § 1311(a).

20         77.    Defendants have been in violation of the SWPPP and BAT/BCT requirements

21  every day since October 1, 1992.  Defendants continue to be in violation of the SWPPP and

22  BAT/BCT requirements each day that they fail to develop and fully implement an adequate

23  SWPPP and BAT/BCT for the Facility.

24                WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

25                          **FOURTH CAUSE OF ACTION**

26  **Failure to Develop and Implement an Adequate Monitoring and Reporting Program
    (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

27         78.    Plaintiff realleges and incorporates Paragraphs 1-77, as if fully set forth herein.

28

COMPLAINT
                                    19

79.     Section B of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement a monitoring and reporting program (including, among other things, sampling and analysis of discharges) no later than October 1, 1992.

80.     Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility. Defendants' ongoing failures to develop and implement adequate monitoring and reporting programs are evidenced by, *inter alia*, their failure to monitor for requisite pollution parameters.

81.     Each day since October 1, 1992 that Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendants to have violated and to be in violation of the Act as alleged herein;

b.   Enjoin Defendants from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility;

c.   Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

d.   Order Defendants to pay civil penalties of $27,500 per day per violation for all violations occurring before March 15, 2004, and $32,500 per day per violation for all violations occurring after March 15, 2004, for each violation of the Act pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

e.   Order Defendants to take appropriate actions to restore the quality of navigable waters impaired by their activities;

COMPLAINT

1    f.   Award Plaintiff's costs (including reasonable investigative, attorney, witness,

2    and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

3    g.   Award any such other and further relief as this Court may deem appropriate.

4    Dated: April 29, 2005                Respectfully submitted,

5                                         LAW OFFICE OF MICHAEL R. LOZEAU

6

7                                   By:   _____

8                                         Michael R. Lozeau
                                          Attorney for Plaintiff
9                                         CALIFORNIA SPORTFISHING PROTECTION
                                          ALLIANCE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
                                          21