1   MICHAEL R. LOZEAU (BAR NO. 142893)
    Law Office of Michael R. Lozeau
2   1516 Oak Street, Suite 216
    Alameda, CA 94501
3   Tel:    (510) 749-9102
    Fax:    (510) 749-9103
4   E-mail: mrlozeau@lozeaulaw.com

5   ANDREW L. PACKARD (Bar No. 168690)
    MICHAEL P. LYNES (Bar No. 230462)
6   Law Offices of Andrew L. Packard
    294 Page Street
7   San Francisco, CA 94102
    Tel: (415) 431-2970
8   Fax: (415) 431-2410
    E-mail: packardal@mindspring.com
9
    Attorneys for Plaintiff
10  CALIFORNIA SPORTFISHING
    PROTECTION ALLIANCE
11

12              UNITED STATES DISTRICT COURT

13              EASTERN DISTRICT OF CALIFORNIA

14

15  CALIFORNIA SPORTFISHING           Case No. 2:05-CV-00856-LKK-PAN
    PROTECTION ALLIANCE, a non-profit
16  corporation,

17                 Plaintiff,

18       vs.                          **CONSENT DECREE**

19  STOCKTON STEEL, a corporation, and  (Federal Water Pollution Control Act,
    THE HERRICK CORPORATION, a          33 U.S.C. §§ 1251 to 1387)
20  corporation,

21                 Defendants.

22

23        **WHEREAS**, California Sportfishing Protection Alliance ("CSPA") is a non-profit

24  public benefit corporation dedicated to the preservation, protection, and defense of the

25  environment, wildlife, and natural resources of California's waters;

26        **WHEREAS**, Stockton Steel is a metal fabrication business located at 3003 E. Hammer

27  Lane in Stockton, California. Stockton Steel's operations and property located at 3003 E.

28  Hammer Lane shall hereinafter be referred to as the "Facility."

                                    1

**WHEREAS**, Stockton Steel is a wholly-owned subsidiary of The Herrick Corporation, a company based in Pleasanton, California. Defendants shall hereinafter collectively be referred to as "Stockton Steel."

**WHEREAS**, Stockton Steel operates a facility of about 41 acres in size on which the company conducts industrial operations relating to the fabrication of steel, including, but not limited to, storing raw materials, storing finished steel products, loading and unloading of steel materials, and transporting of finished steel products.  Storm water is collected in various storm drains located throughout the mostly unpaved facility and is conveyed to a storm drain channel that extends along the entire western side of the Facility.  When storm water collected in the storm drain channel exceeds the level of the inlet pipe, it is pumped to Mosher Slough, a tributary of the San Joaquin River and Delta.  A site map of the facility is attached hereto as Exhibit "A" and is hereby incorporated by reference.

**WHEREAS**, storm water discharges associated with industrial activity are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 91-13-DWQ (as amended by Water Quality Order 92-12 DWQ and 97-03-DWQ), issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342 (hereinafter "General Permit");

**WHEREAS**, on February 24, 2005, CSPA provided notice of alleged violations of the General Permit by Stockton Steel and CSPA's intention to file suit against Stockton Steel, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"); and to Stockton Steel, pursuant to Section 505 of the Federal Water Pollution Control Act ("Act"), 33 U.S.C. § 1365.  A true and correct copy of CSPA's notice letter is attached as Exhibit B.

**WHEREAS**, on April 29, 2005, CSPA filed a complaint ("Complaint") against Stockton Steel in the United States District Court, Eastern District of California, Sacramento

2

Division;

**WHEREAS,** Stockton Steel denies CSPA's allegations that it has violated the General Permit or the Clean Water Act, 33 USC 1251 *et seq.*

**WHEREAS,** the Parties have decided that is in the best interest of both parties to resolve the litigation without the taking of any evidence or findings of fact or law;

**WHEREAS**, this Consent Decree shall be submitted to the United States Department of Justice for the 45 day statutory review period, pursuant to 33 U.S.C. § 1365(c).

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES, AND ORDERED AND DECREED BY THE COURT, AS FOLLOWS:**

**I.** **COMMITMENT OF STOCKTON STEEL**

1.  Stockton Steel agrees to operate the Facility in compliance with the applicable requirements of the General Permit and Clean Water Act.  The Parties anticipate that the California State Water Resources Control Board will issue an amended or revised General Permit in the future.  Upon the effective date of the amended or revised General Permit, Stockton Steel agrees to comply with the applicable provisions of the amended or revised General Permit, as long as the Stockton Steel facility continues to fabricate structural steel.  If Stockton Steel believes that any of the provisions of this Consent Decree conflict with the amended or revised General Permit, Stockton Steel  shall provide notice of any such alleged conflict to CSPA within 30 days of the State Water Resources Control Board's issuance of the amended or revised General Permit.  Pursuant to Paragraph 31 below, the parties shall meet and confer to attempt to resolve any dispute arising from such alleged conflict.

2.  In order to prevent storm water from coming into contact with contaminants at the Facility and/or to prevent the discharge of waste, contaminated storm water and unauthorized non-storm water from the Facility into the waters of the State and of the United States, Stockton Steel shall implement structural and non-structural best management practices ("BMPs") as described more fully below.  Stockton Steel shall maintain all

structural BMPs at the site in good operating condition.  The effectiveness of the BMPs shall be measured by comparing analytical results of storm water discharge samples with the "Benchmark Levels" set forth in Exhibit C, which is hereby incorporated by reference.  If the results of Stockton Steel's storm water samplings exceed the Benchmark Levels set forth in Exhibit C during the 2005-2006, 2006-2007, and/or 2007-2008 rainy seasons, Stockton Steel agrees to investigate the potential cause of the exceedence and agrees to develop and implement additional BMP's where appropriate and feasible consistent with the requirements set forth in paragraphs 21 through 24 below.

### Improvements to the Facility's Storm Drain Channel and Discharge Point

3.   As of the Effective Date of this Consent Decree, in order to maximize the storage capacity of the storm drain channel and promote the settling of suspended solids in storm water collected in the channel, Stockton Steel shall complete installation of a revised storm water outfall inlet making the mouth of the inlet horizontal to the ground and increasing the vertical height of the pipe by approximately 3 feet measured from the elevation of the existing surface of the drainage channel.  The specifications of the alterations to the discharge intake pipe are attached hereto as Exhibit D and are hereby incorporated by reference.

4.   Within 15 days of the Effective Date of this Consent Decree, in order to further promote the settling of suspended solids in storm water collected in the channel, Stockton Steel shall design and commence construction of two check dams in the Channel, as specified in Exhibit E, which exhibit is hereby incorporated by reference.  The two check dams shall be constructed and in place prior to October 15, 2005.  Stockton Steel shall document the installation of the check dams by photographing the completed check dams upon the date of their completion and certifying the date of completion.

5.   Within 30 days of the Effective Date of this Consent Decree, in order to reduce sediments entering the storm drain channel through erosion of unpaved areas that drain directly to the storm drain channel, not including those areas draining to storm drain drop inlets at the Facility, Stockton Steel shall identify areas eroding into the channel and

4

implement erosion control measures in these areas, which may include storm water velocity control measures and repairing gullies or visible erosion where erosion is occurring or has occurred along the bank of the channel.  Such measures shall be implemented, at a minimum, at the locations marked as "a" and "b" on the Facility map attached hereto at Exhibit A. Stockton Steel shall document the erosion control measures by photographing areas of erosion to the channel immediately before and immediately after installing such measures.

6.   Stockton Steel shall review sediment levels annually and by July 1 of each year review the need to remove sediments and other materials that build up in the storm drain channel.  Stockton Steel shall document sediment removal activities, including the date of such activities, a description of the activities, who conducted the activities, an estimate of the volume of sediment removed from the channel, and any analytical results of materials removed from the channel in the Facility's Storm Water Inspection Log.  Any sediment removal activities shall be photographed, including representative before and after photographs of the storm drain channel and representative shots of the removal activity.

**Storm Drain Drop Inlets**

7.   Within 30 days of the Effective Date of this Consent Decree, in order to reduce sediments entering the storm drain channel through erosion of unpaved areas that drain directly to the storm drain channel through storm drain drop outlets installed throughout the Facility, Stockton Steel shall install the following management measures:

a.      For those drop inlets located in areas of the Facility where fork lift traffic and fabricated steel storage preclude the implementation of measures involving the raising of the edges of drains or the installation of drain filters, Stockton Steel shall place a cover over such drains effectively sealing the drains for the duration of the dry season, from May 31 through September  30 of each year. The drop inlets to which this subsection applies are those located within the areas on the site map marked as "c."

[PROPOSED] CONSENT DECREE                              Case No. 2:05-CV-00856-LKK-PAN

b.    For those drop inlets located in areas of the Facility not subject to fork lift traffic or used for storing fabricated steel, Stockton Steel shall either raise the inlets by at least six (6) inches above ground surface to prevent any storm water from flowing directly into these storm drain drop inlets, or shall install straw berms or fabric berms completely around each drop inlet and keyed into the ground at least 4 inches below the surface of each inlet between October 15 and May 30 each year.  The drop inlets to which this subsection applies are those located within the areas on the site map marked as "d."

**Sweeping**

8.    As of the effective Date of this Consent Decree, in order to reduce pollutants generated inside the Facility's processing buildings from migrating onto unpaved areas of the Facility and becoming available for transport by storm water at the Facility, Stockton Steel shall sweep, collect, and dispose of the sweepings, at least twice a day, to prevent the accumulation of pollutants, from the paved areas of the Facility at each of the entrances to the fabrication buildings located at the facility, as indicated by the areas marked as "e" on Exhibit A.  Stockton Steel also shall sweep, collect, and dispose of the sweepings, at least twice a day, to prevent the accumulation of pollutants on surfaces inside the fabrication buildings (marked as "f" on Exhibit A) that may be tracked from the buildings by the movement of fork lifts or other vehicles.

9.    As of the Effective Date of this Consent Decree, Stockton Steel shall also sweep or clean or both, at least once daily, all areas on Girardi Way, across which Stockton Steel or trucks exiting the Facility discharge, transport, transfer, or otherwise move or load materials and equipment, or emit wastes, to prevent pollutants from moving into the City of Stockton's storm drains.

10.   Within 60 days of the Effective Date of this Consent Decree, in order to minimize the tracking of mud and dirt off of the Facility to the adjacent public street, Stockton Steel shall pave the area adjacent to the exits from the Facility's storage areas for a distance of

6

at least 50 feet, as approximately indicated by the areas marked "g" on Exhibit A. Stockton Steel shall apply the sweeping requirements of Paragraph 9 to these paved areas.

11. As of the Effective Date of this Consent Decree, all collected dust and sweepings at the Facility shall be deposited in bins and either be stored indoors, or, if stored outdoors, shall be covered, except when in the process of being dumped, to prevent dust, shavings, and other materials from being blown or washed outside the waste storage bins.

### Sampling, Monitoring, Inspection and Reporting

12. Stockton Steel shall maintain daily logs of all sweeping activities at the Facility, including date, time, and the name of the person conducting the sweeping and listing any photographs taken of the sweeping activity.

13. Stockton Steel shall conduct daily inspections of the two entrances/exits from the Facility to Girardi Way. The entrances/exits are defined as "g" on Exhibit A. Each Friday, the inspection shall include at least one weekly photograph of each entrance/exit taken upon the completion of sweeping or any other management measure clearly representing the presence or absence of dirt, gravel, mud or other materials that may be tracked from the facility onto the public street. The weekly photograph shall be required from October 1 through May 30 of each wet season.

14. Stockton Steel shall photograph the condition of the storm water channel and the storm water outfall inlet whenever a water sample is collected. Photographs shall be in color and shall include, but not be limited to, photographs of storm water entering the inlet to the storm water outfall, the condition of the check dams, any erosion or gullying of the channel's sides or banks and any visible sources of pollutants entering the channel.

15. All photographs required by this Consent Decree shall be electronically formatted. Each photograph shall be identified by date, the person taking the photograph and the location of the Facility being photographed. The title of each electronic photograph shall include, at a minimum, the date it was taken, the initials of the person taking the photograph and the location of the photographed area (for example, "3.3.06 MRL Channel Upgradient of

Check Dam #2).  Any photograph required by this Consent Decree shall be provided to CSPA upon request via compact disc(s).

16.     Stockton Steel shall collect samples from the Facility's storm water outfall, marked as "i" on Exhibit A, according to the sampling schedule set forth below.  In the event that Stockton Steel is able to prevent storm water discharges from the storm water outfall or any other discharge location, then although no sampling would be required from the outfall, Stockton Steel shall collect samples of storm water collected in the storm drain channel as set forth in Paragraph 18 below.

17.     For the term of this Consent Decree and except as set forth below, Stockton Steel shall collect four samples during the 2005-06 rainy season and three samples during each of the subsequent rainy seasons (2006-07 and 2007-08) from the facility's storm water outfall.  The samples shall be taken at the storm water outfall within the first hour that a discharge occurs so that a sample can be taken; provided that all sampling shall be conducted during daylight hours of operation of the Facility.  Sampling events shall be preceded by at least three (3) working days without storm water discharges.

18.     If less than the requisite number of storm events meeting the above criteria occur per year, Stockton Steel shall be obligated to take samples only during each of the storm events that do occur during that wet season which meet the criteria.  However, if by February 7th of any of the above referenced rainy seasons, no discharges have occurred from the storm water outfall meeting the above criteria, Stockton Steel shall comply with the sampling frequency set forth above by sampling discharged storm water that is not preceded by three dry days.  If by March 1 of any of the above referenced rainy seasons, no discharges have occurred from the storm water outfall, Stockton Steel shall comply with the sampling frequency set forth above by sampling runoff  that has collected in the storm drain channel.  Such samples shall be collected as close as possible to the inlet to the storm water outfall and when the collected stormwater in the channel at the inlet to the storm water outfall is at least one foot deep.  Stockton Steel shall maintain a log of all rain events occurring at the Facility

8

during daylight hours of operation of the Facility, including date, duration, whether a discharge occurs from the storm water outfall and level of water in storm water channel. Such log shall be made available to CSPA upon request. The results of any samples collected from the storm drain channel shall not be considered discharge samples and shall not be submitted to the RWQCB, included in the Facility's Annual Report or otherwise constitute a discharge from the Facility, but may be used by the Parties to evaluate the effectiveness of measures taken by Stockton Steel.

19.    All samples collected from the Stockton Steel Facility shall be delivered to a California state accredited environmental laboratory and shall be analyzed in accordance with the provisions of the General Permit.

20.    Analytical methods used by Stockton Steel or its analytical laboratory shall be adequate to detect the individual constituents at or below the Benchmark Levels set forth in Exhibit C. Results from Stockton Steel's sampling and analysis shall be provided to CSPA within fourteen (14) days of receipt of the final written laboratory report from each sampling event.

21.    If any sample taken during the three rainy seasons covered by this Consent Decree exceeds the Benchmark Levels set forth in Exhibit C, Stockton Steel shall, not later than 30 days from receipt of the analytical results for the fourth sample of the rainy season or June 15th, whichever is sooner, prepare a written statement discussing the exceedance, the possible cause and or source of the exceedance, and measures that will be taken to address and eliminate the problem and eliminate subsequent future exceedances ("Memorandum"). Such additional measures may include, but are not limited to, making further structural or nonstructural improvements to the storm water channel, changing storage activities so that additional pollution control measures are implemented in the Facility's drop inlets, preventing storm water discharges from the Facility, or modifying other industrial activities at the facility. Such additional measures shall be implemented as soon as practicable but not later than 21 days from the due date of the Memorandum, except where structural changes require longer

9

than 21 days to complete.  Within thirty (30) days of implementation, Stockton Steel's SWPPP shall be amended to include all additional BMP measures designated in the Memorandum.

22.     Such Memorandum shall be mailed to CSPA via certified mail upon its completion.  CSPA may review and comment on any additional measures.  When requested by CSPA within 7-days of receipt of such Memorandum, CSPA and Stockton Steel shall meet and confer and conduct a site inspection within 21-days of the due date of the Memorandum to discuss the contents of the Memorandum and the adequacy of proposed measures to improve the quality of the Facility's storm water to below the Benchmark Levels.  If within 14-days of the parties meeting and conferring, the parties do not agree on the adequacy of the additional measures set forth in the Memorandum, the parties agree to enter into a mediation process; the cost of the mediation service shall be borne by Stockton Steel.  Mediation shall be completed within 65 days of the due date of the Memorandum.  The parties stipulate to retaining JAMS in their San Francisco, California office, to conduct such mediation.  If the parties fail to reach agreement on additional measures, CSPA may bring a motion seeking injunctive relief from the District Court consistent with Paragraph 31 below.  If CSPA does not object to the Memorandum within the seven (7) day comment period, it shall waive any right to object to such Memorandum pursuant to this Consent Decree.

23.     Any concurrence by CSPA with regard to the reasonableness of any additional measures implemented by Stockton Steel shall not be deemed to be an admission of the adequacy of such measures should they fail to bring the Facility's storm water into compliance with the Benchmark Levels or water quality criteria.

24.     In addition to any site inspections conducted as part of meeting and conferring on additional measures set forth above, Stockton Steel shall permit representatives of CSPA to perform up to three (3) site visits to the Facility during normal daylight business hours during the term of this Consent Decree during the rainy seasons; provided that CSPA provides Stockton Steel with at least forty-eight (48) hours prior written notice.

25.     During the life of this Consent Decree, Stockton Steel shall provide CSPA with a copy of all documents submitted to the Regional Water Quality Control Board, the State Water Resources Control Board, and the City of Stockton, concerning the Facility and its storm water discharges, including but not limited to all documents and reports submitted to the Regional Board and/or State Board as required by the General Permit.  Such documents and reports shall be mailed to CSPA contemporaneously with submission to such agency.

26.     Stockton Steel shall achieve all applicable Benchmark Levels set forth in Exhibit C in storm water discharges from the Facility by the expiration date of this Consent Decree.  It is the position of Stockton Steel that Benchmark Levels are not numeric effluent limits.  In recognition of that position, if storm water discharges have not achieved Benchmark Levels by the expiration of this Consent Decree, the Parties, pursuant to paragraph 31 below, will meet and confer to discuss whether any additional measures are feasible or appropriate.

27.     Within sixty (60) days of the Effective Date of this Consent Decree, Stockton Steel shall amend the Facility Storm Water Pollution Prevention Plan ("SWPPP") to incorporate all changes, improvements and best management practices set forth in this Consent Decree.  A copy of the amended SWPPP shall be provided to CSPA within seven (7) days of completion.

## II.     MITIGATION FEES AND COSTS

28.     As mitigation of the violations alleged in CSPA's Notice and Complaint, Stockton Steel shall pay the sum of $62,500 to the Rose Foundation for Communities and the Environment ("Rose Foundation") for projects benefiting water quality in the Stockton metropolitan area.  The Payment shall be conditioned on the following:  (a) the Payment or any portion thereof shall not be disbursed or otherwise granted directly or indirectly to CSPA, (b) projects funded by the Payment shall be designed to benefit water quality in the lower San Joaquin River, the Sacramento-San Joaquin River Delta, or their tributaries, and (c) projects funded by the Payment shall be designed to benefit water quality within 30 miles of the

Facility.  Within thirty (30) days of the Effective Date of the Consent Decree, the Payment shall be made to the Rose Foundation.

29.     Stockton Steel shall reimburse CSPA in the amount of $31,000 to defray CSPAA's investigation fees and costs, expert fees and costs, reasonable attorneys' fees, and all other costs incurred as a result of investigating the activities at the Facility, bringing these matters to Stockton Steel's attention, and negotiating a resolution of this action in the public interest.  Such payment shall be made within thirty (30) days of the Effective Date of the Consent Decree.

30.     Stockton Steel shall reimburse CSPA up to three thousand dollars ($3,000) per year for three years for reasonable costs and fees associated with monitoring Stockton Steel's compliance with this Consent Decree.  Monitoring activities include site inspections, review of water quality sampling reports, review of annual reports, discussion with representatives of Stockton Steel concerning potential changes to compliance requirements, preparation and participation in meet and confer sessions and mediation, water quality sampling, etc.  Three (3) annual payments shall be made payable to Michael R. Lozeau Attorney-Client Trust Account within thirty (30) days of receipt of an invoice from CSPA which contains a daily and hourly description of fees and costs incurred by CSPA to monitor implementation of the Consent Decree during the previous twelve (12) months.

III.    **Dispute Resolution and Enforcement of Consent Decree**

31.     With the exception of the meet and confer process set forth above at Paragraphs 21 and 22 for addressing exceedances of Benchmark Levels, if a dispute under this Consent Decree arises, or either Party believes that a breach of this Consent Decree has occurred, the Parties shall meet and confer within fourteen (14) days of receiving written notification from the other Party of a request for a meeting to determine the merits of the dispute or whether a violation has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the violation or dispute.  If the Parties fail to meet and confer or the meet and confer does not resolve the issue, after at least seven days have passed after the meet and

confer occurred or should have occurred, either Party shall be entitled to all rights and remedies under the law, including bringing a motion before the District Court of California, Eastern District, which shall retain jurisdiction over the Action for the limited purposes of enforcement of the terms of this Consent Decree.  The parties shall be entitled to seek fees and costs incurred in any such motion, and such fees and costs shall be awarded, pursuant to the provisions set forth in the Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), and applicable case law interpreting such provision.

32.    Upon entry of this Consent Decree, CSPA, on its own behalf and on behalf of its members, subsidiaries, successors, assigns, directors, officers, agents, attorneys, representatives, and employees, releases Stockton Steel (and its agents, attorneys, representatives, employees, and assigns) from, and waives, all claims, whether known or unknown, for damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed in this Action, for the alleged failure of Stockton Steel to comply with the Clean Water Act at the Hammer Lane Facility, up to the Effective Date of this Consent Decree (hereafter "Claims"), except as specifically provided for in this Consent Decree.

33.    Stockton Steel, on its own behalf and on behalf of its agents, attorneys, representatives, employees, and assigns, releases CSPA (and its members, subsidiaries, successors, assigns, directors, officers, agents, attorneys, representatives, and employees) from, and waives all claims, whether known or unknown, which arise from or pertain to this Action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters associated with or related to this Action.

34.    The Parties enter into this Consent Decree for the purpose of avoiding prolonged and costly litigation.  Nothing in this Consent Decree shall be construed as, and Stockton Steel expressly does not intend to imply, any admission as to any fact, finding, issue

of law, or violation of law, nor shall compliance with this Consent Decree constitute or be construed as an admission by Stockton Steel of any fact, finding, conclusion, issue of law, or violation of law.  However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Consent Decree.

**IV.**   **Miscellaneous Provisions**

35.    The Effective Date shall be the date this Consent Decree is approved and entered by the Court.

36.    The Consent Decree shall continue in effect until September 1, 2008.

37.    The Consent Decree may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.

38.    In the event that any of the provisions of this Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

39.    The language in all parts of this Consent Decree, unless otherwise stated, shall be construed according to its plain and ordinary meaning.

40.    The undersigned are authorized to execute this Consent Decree on behalf of their respective parties and have read, understood and agreed to all of the terms and conditions of this Consent Decree.

41.    All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Consent Decree are contained herein.

42.    Any notices or documents required or provided for by this Consent Decree or related thereto that are to be provided to CSPA pursuant to this Consent Decree shall be hand delivered or sent by U.S. Mail, postage prepaid, and addressed as follows:

Jim Crenshaw, President
California Sportfishing Protection Alliance
1248 E. Oak Avenue, #D
Woodland, CA  95776

With copies sent to:

14

1

2       Michael R. Lozeau
        1516 Oak Street, Suite 216
3       Alameda, CA  94501
        mrlozeau@lozeaulaw.com

4              Any notices or documents required or provided for by this Consent Decree or related

5       thereto that are to be provided to Stockton Steel pursuant to this Consent Decree shall be sent

6       by U.S.  Mail, postage prepaid, and addressed as follows:

7       Doug Griffin
        Stockton Steel
8       3003 E. Hammer Lane
        Stockton, CA  95205-2801
9
        With copies sent to:
10
11      Anthony Garvin
        Morgan, Lewis & Bockius LLP
12      One Market, Spear Street Tower
        San Francisco, CA  94105

13      Each party shall notify the other parties of any change in their contact information within 14

14      days of any such change.

15             43.     Signatures of the Parties transmitted by facsimile shall be deemed binding.

16             44.     No Party shall be considered to be in default in the performance of any of its

17      obligations when a failure to perform is due to a "Force Majeure." A Force Majeure event is

18      any act of God, war, fire, earthquake, flood, and restraint by court order or public authority.  A

19      Force Majeure event does not include normal inclement weather, such as anything less than or

20      equal to a 100 year/24 hour storm event or inability to pay.  Any Party seeking to rely upon

21      this paragraph shall have the burden of establishing that it could not reasonably have been

22      expected to avoid, and which by exercise of due diligence has been unable to overcome, the

23      Force Majeure.

24             45.     If for any reason the Court should decline to approve this Consent Decree in the

25      form presented, the Parties shall agree to work together to modify the Consent Decree

26

27

28

---

15

[PROPOSED] CONSENT DECREE                              Case No. 2:05-CV-00856-LKK-PAN

within 30 days so that it is acceptable to the Court.

46.     The settling Parties hereto enter into this Consent Decree, Order and Final Judgment and submit it to the Court for its approval and entry as a final judgment.


California Sportfishing Protection Alliance


Dated:                                    By  /signature on original
                                               Jim Crenshaw, President

Dated:                                    Stockton Steel and The Herrick Corporation


                                          By /signature on original
                                             Doug Griffin, Chief Financial Officer

**IT IS SO ORDERED**.

Dated: August 15, 2005.            /s/Lawrence K. Karlton
                                   Lawrence K. Karlton
                                   Senior Judge, United States District Court